23-2362 United States of America v. Hernandez In this illegal entry case, the magistrate judge made two errors. He failed to enforce the government's Brady and Rule 16 obligations, and he also admitted statements that were made after an inadequate Miranda advisory. The defense asked in their initial discovery request that there be all of this information turned over, and one of the important things was, was this agent, were any agents, a member of the group? It matters, Your Honor, because the arresting agent is the only agent who could have testified as to, this was the person, this is what he said, and if that agent, if there were issues as to his credibility, if it was possible to impeach him, then the government doesn't have a case. Do you credibly claim it wasn't him that was arrested? Well, I don't think, I think that's a little bit of a shift. That's why this whole argument seems to me to be theoretical, not real. What could possibly matter? I mean, suppose the agent had enormous bias against people coming into the country unlawfully. Your client was caught inside the country unlawfully. Why does the agent's feeling matter? Because the agent is a witness, and we have the right to go after the credibility of any witness. Yeah, how could it possibly be prejudicial? I think this is what you're not saying, but my understanding is this is one of those rare cases where the charge is 1325, the crime 1326, so the question is, it's a skinny defense, right? It's a very skinny defense to Judge Clifton's point. But I think your position is they had to prove, beyond a reasonable doubt, the government had to prove, beyond a reasonable doubt, how we got there. Exactly. And if he'd come through a port of entry, they'd charge him incorrectly. Exactly. So because we technically, those are two different statutes. Exactly. Okay, so it's a very skinny defense, because to Judge Clifton's point, he's found here and he doesn't have any papers and he, this is it, right? That's the only thing he's got. Exactly. One of the elements is that he had to, the government had to prove the way he entered. And the agent didn't say, I saw him go over a fence, not at a port of entry. It was where he was caught that made the port of entry defense so unlikely. Right. So I don't see any prejudice that could have flowed or any materiality. I mean, you could try to attack his credibility by saying he was prejudiced because he's a member of this group. But I don't see how that changes the fact that the location where your client was apprehended is a place that doesn't suggest that he came through a port of entry. It's not called an attack. So I think this then would shift to the Miranda issue a little bit. Because the judge, the I would rely on that statement, the post-arrest statement, as the body of the evidence against you. The which post-arrest statement? The post-arrest statement. In the field or in the case? Post-Miranda. In other words, that's why this goes to the Miranda issue. The one that was recorded. Right. And your Honor may, I understand that your Honor believes that this evidence may be overwhelming. But the test is not whether this court would say, if I was looking at this evidence for the first time, I would say it's overwhelming. The question is, did it contribute to the verdict? Let me ask you a foundational question. Let me see if I understand the defense theory. Defense theory is, he arrived at or near the port of entry in a vehicle and then was let out of the vehicle and told to cross on foot. And then he was expected to be picked up on the other side after the smuggler car went through the port of entry. No, your Honor. The defense theory would be that the government, that it is possible that he could have entered in two ways. One of which was being smuggled through the port of entry, for instance, in the trunk of someone's car. But if that were the case, then how do you explain what he's doing eight miles east of the port of entry and two and a half miles north of the Mexican border in a rugged area with a backpack? Well, there was evidence, for instance, that there were roads, that there were houses, that there was a gun club a mile away. In other words, this was not as remote as some areas are. We're reasonably familiar with this terrain. But your defense isn't that he, I think your defense was really skinny. I don't even think it's that. I think it's that they didn't prove that he didn't. They have to prove, the government have papers proving, right? Because this is a 1325. Correct. Okay, so because you're not disputing they got here and you're not disputing they didn't have papers and you're not, so it's a very, you're just putting the government to the burden of proof. Exactly. And the one thing that really hangs amidst the admission that he walked through the mountain. Correct. And that was in the post-arrest statement and that's what the magistrate judge relied on. So again. So why does the potential membership of the agent in this organization possibly affect the outcome of that analysis? Well, that would go to the discovery issue. If we want to switch back to the discovery issue. I couldn't figure out what possible relevance the desired discovery could have had on the outcome of this case. I know. I mean, you can ask for the world, but if it doesn't matter, they don't have to give you the world. And there are a whole other issues involving with the discovery in terms of the time it would take and so forth. But just at a beginning point, I don't see how any of these requests could have made a difference to the outcome. And if it didn't make a difference, why would we care? Well, the government had to prove four elements. Well, and yes, but they proved where he was apprehended and that doesn't appear to be contested. And based on that, it seems to me it's a very difficult cell to suggest he was smuggled through in a trunk as opposed to across the border someplace else. Well, Your Honor, the Supreme Court has said numerous times that a confession will seldom be harmless. And so here to the extent that... Well, I'm not even getting to the confession. I'm saying just where he was apprehended makes it a very difficult cell that he was smuggled in a trunk through the border somehow. He came in through a port of entry, got dropped off, and promptly went off into the wilderness. And I understand, Your Honor, that that may seem like overwhelming evidence to you, but the test is not do you look at the evidence and see that it's overwhelming? The test is did it contribute to the verdict? And here we know it contributed to the verdict because the magistrate judge said I would rely on that statement as the body of the evidence against you. Okay, but we're talking about this evidence of his participation in this Facebook group. And so you wanted the evidence. We wanted the evidence. Because it's generally... because the government was only going to go with the one agent and you wanted to be able to damage his credibility, attack his credibility. Okay, so we understand that. But that was disclosed by the government that the arresting officer had been part of that group. And my understanding is sort of the protocol is that the government has to give that notice and has to have checked what I understand to be a database to see whether this officer did more than sort of be a member of the group. That is, did he post? Did he really participate in this banter that's offensive and would otherwise subject him to a credibility attack? And my understanding is they did that. And so, right, and in other cases where I have seen this counsel, which you're probably familiar with, the government has given that notice. And when there's a hit, that is when the officer didn't just sort of... there was more than just membership in the group, but he actively participated in the offensive postings, then there's an in-camera review by the court. So why is it that in this case the government had to do more than give notice? I understand that you thought that notice was late and that it was before trial. And I'm also sure the judge, you know, his office should have told the court that they had done that review. Because, Your Honor, there's a difference just because, for instance, a post or something that an agent likes on a Facebook group doesn't rise to the level of disciplinary action against that agent doesn't mean that it wouldn't be an impeachment material. There could be, you know, something that would be serious enough that you would go after the agent in an investigation, but not necessarily... but something that could be used at trial and not necessarily rise to the level of discipline. And the late disclosure the night before trial basically prevented us from having any ability to go on our own and find that. Unless you were willing to waive speedy trial and take up the magistrate judge's offer to consider in camera the material, which would have required a short continuance of maybe a couple of weeks. That's true. But the problem, as we've argued, Your Honor, is that that was putting Mr. Hernandez in a coercive position where he had to decide between his rights. And in Garrity... But he'd previously assured the court that there were no discovery issues. Yes. And this material apparently didn't reach the prosecutor until the night before the trial. There's nothing in the record saying that. I thought that's what... No. And in fact, Your Honor, when we said, no, the government's complying with discovery, that was because we had made a request for this evidence. The government had not given us anything, and so we made a good faith assumption that he was not a member of this group. And so the government had more than a year to... The fact that he was a member of the group still doesn't respond to what Judge Christin was asking you about, and Judge Clifton as well, and that is whether or not it's even impeachable at all. In other words, the fact that he belonged to... There were, what, 7,000 participants in this Facebook group? Your Honor, an arresting agent is the most important witness at trial. Okay, but that still doesn't answer... We don't know what, if anything, he posted on the Facebook page, right? And that's the whole point of, if we don't get to discovery, then the remedy that we're seeking for that is a remand for the production of that evidence. I think you might both know something we don't know, which is often the case. I know a high and low argument. But what I just described is my understanding of this obligation of government. That's been established where? Henthorne? No, no. For this particular Facebook group, that the government would go through this protocol, is it just Henthorne, or was there not some kind of an agreement as to this particular incident with this Facebook group? Government counsel can speak to this as well, but I'm not aware that there's a particular sort of agreement. But I think the government has essentially agreed that this I'm 1015 information would be relevant and would be impeachment material. It's agreed, and so he'll have a chance in a minute. But my understanding, so you can both have an opportunity to correct me if I'm wrong, is that the government has agreed that it would be impeachment. So they're giving notice of who was a member. And they're, I think, maybe it's voluntary, I don't know, taking upon itself the burden to look through this, I'm calling it database, that might be the wrong term, to see whether or not the person actually posted. And then that's where they sort of draw the line in the sand. But if I've got that wrong. My understanding is slightly different, Your Honor. And I would say that they, the government's investigation is as to was an agent disciplined for their activity in that group? So for instance, an agent. That's the next step I was just going to get to. Oh, okay. Discipline. So it's actually a three-step process. So you can correct me if I'm wrong, right? So you're not contesting they gave you a notice that this officer was a member of the Facebook group, and they, on record, said that they looked to see whether or not he had posted. Is your objection that they didn't look to see whether or not he might have otherwise been disciplined, or that there, maybe it's that there might have been evident material, impeachment material, short of discipline? I'm not, it's not my understanding from the record that they said he never posted. It's my, and that was the case in, for instance, the Bernal Sanchez case. I'm not aware that they claimed that here. I think they've only said here that this, he was not disciplined. And government counsel can certainly correct me if I'm wrong. Okay. I would like to save some time for rebuttal, if it's possible. And thank you for your patience with our question. Did I cut you off? No, no. I didn't go further. Thank you, counsel. Thank you. We'll have two minutes on the clock when you come back. Maybe government's counsel can clear this up. I'll try to, Your Honor. May it please the Court, Interim Chief of the United States. And I'll start with the 1015 issue. Thank you. First, I want to, you know, share my agreement with Judge Clifton that to the extent that there was any discovery violation with the 1015 material, it was harmless. But I want to focus my attention on the fact that our position is that there was no discovery violation. What happened in this case was that Hernandez requested in his written discovery request, just for whether or not Agent Norelveni was part of that group, whether he was a member of that group, and we provided that information. Can I, if you'll excuse me for interrupting, but there's the one, I don't have the dates, there's the one hearing at which defense counsel represented to the court that it didn't need to rule on the other discovery motions. And so I think it's an express waiver, but the request you're speaking of now for the 1015 information, did that come later, closer to trial? Well, that request had been made early on in the case. I think it was about a year, about 10 months, about 10 months before the trial. And then the day before the trial, the AUSA disclosed to the defendant that the agent Back up then, if you would forgive me for interrupting, back up then to the first hearing. This is where the judge is going through and ruling on a bunch of discovery motions.  And then the defense counsel says he's going to hold the motion in abeyance, and then defense counsel says I don't believe there's an ongoing issue we've been conferring regarding discovery, and Ms. Fox has produced substantial discovery. The judge says I'll deny that as moot. The judge says I think that's fine at this time. So at that point of this hearing, you're saying that the 1015 request was outstanding? Well, I think the 1015 request was outstanding. And I think that what had happened was the government had conducted its Henthorne checks, and its Henthorne checks came back negative. And so that was probably... Does that mean what's packed into conducting a Henthorne check in a 1015? Yes. And I'll get into that because the AUSA in this case explains that to the court in the second discovery hearing. And so what happened in this case was the AUSA said that, first of all, let me back up and talk about Henthorne. What Henthorne requires is for the AUSA to go to the agency and ask, is there any impeaching material on this agent that we need to turn over to the defense? Correct. And so that's what the AUSA did in this case. And he did exactly what he was supposed to do under Henthorne. He went to agency counsel, asked the agency counsel if there was any impeaching material, and there wasn't any. And that was what he told the judge at the discovery hearing. Now, the record isn't clear. You're still packing too much in there. Okay. What does that involve? We're really very interested in this because it's an important obligation. Yeah. And so is it the government's practice or has it been a court order or a stipulation or an agreement that within its Henthorne duties, once this group popped up, is it the government's practice to look to see whether or not an agent is a member of the group and whether he posted, he or she posted? I can't speak to what is outside the record of this case. Maybe I can help you because I was on the Bernal Sanchez case, and that was the representation of the government at that time. And if I'm misunderstanding that, it would be helpful for me to know. I believe that what happened in this case with the AUSA in this case was the AUSA went to the general counsel's office for CPD and asked that office whether or not there was any impeaching material that was available for this particular agent. And the agency counsel's office went back to him and said that there wasn't. I think that was the check. That was the particular check. I don't know what they checked. Is that the problem? I think that's where Judge Christin is getting at. Yes. And I think here it might be a good time for me to explain why Bernal Sanchez is disrespectful from the facts of this case. I'm really familiar with Bernal Sanchez. So before we get to that, please, and I'm happy to, I'm not trying to get in your way, but I think there had to have been more than just no, there's no impeachment material because I think the U.S. attorney representative to the court we've checked, he was a member of the group. That was a discovery request. Was he a member of the group? But I think there's confirmation that he was a member of the group, but not that he had not posted. Do I misunderstand? Well, he did tell the court that he was a member of the group and that he provided this information the day before trial, but the record does not explain how he learned that information. Well, presumably, so I'm checking with his client, but okay. Well, I think. That difference doesn't make how he learned that. Maybe I'm missing something there. Why do I care about that? Right. I don't think it doesn't make a difference. I think he disclosed that information to the defense, and that was the information that the defense requested. The defense did not ask for additional information. It was apparently satisfied with the information that it received, and then it actually used that information while cross-examining Agent Norelli. So, can I ask you the other question, and I promise I'm going to try to go on to another subject, but is there anything in any of these cases where the government has taken on this burden or been ordered to take on the burden as part of Hamthorne or otherwise, to check to see about membership in the group, to check to see about whether or not there have been any postings? And I think the practice, as it was represented in Bernard Santos, is if there had been postings by the officer, then there should be an in-camera review. Is that your understanding? Maybe that's just all happening under the rubric of Hamthorne. Is that right? Well, Your Honor, my understanding is that I know you're very familiar with Bernal Sanchez, but my understanding of what happened in Bernal Sanchez was that the court had ordered the government to – the court had held that the government should have gone above and beyond what was required in Hamthorne because due to the contemporaneous nature of the CBP's investigation into improper Facebook activity in that case, the record of that case was not clear whether or not any findings by CBP of improper Facebook activity would have made it into the agent's personnel file in time. Exactly. So there was – as Judge Tallman indicated, there were a lot of people who were members of that Facebook. So it's taking a long time to get through, right? Right. And then from one of these other cases that I've had, I became aware that that process was complete, right? And the idea was any disciplinary action that flowed out of that investigation would have made it into the personnel file. So I think at the time of Bernal Sanchez, we didn't know that it would have hit the personnel file yet. Correct. But we knew that in this case. And I show that – I tried to explain that in page 43 of our brief, and that's at footnote 47. We showed that the investigation had been completed by June of 2020 and that any improper activity on that Facebook site would have been transmitted to CBP's counsel's office by June of 2020. And that's a very important date because in the record of this case, the defendant did not make the request for Agent Norelli's personnel file until October of 2020. And we know from the record of this case that in response to that motion, the AUSA in this case went back and checked with agency counsel to see if there was any improper information, and the response he received was no. So to the extent that in Bernal Sanchez and Thorne was insufficient, it was not insufficient for purposes of this case. Okay, so some of what you just said I think was not in our record or in the briefing here, but it's in both of your hits. So that was helpful to get that, but I think we're all caught up. That brings us right to the point of opposing counsel's argument today, which is that her concern about her ongoing, what she considers to be an ongoing discovery request, is that there may be some delta between defense counsel's view of what is impeaching that she would want for cross-examination and what the employer would have deemed a triggering event for purposes of discipline. What about that? Well, I think what the defense was asked, well, first of all, again, I want to emphasize that in the discovery, in this trial, they didn't ask for anything more than whether or not Agent Norelli was a member of that group, and we provided that information. But to the extent that they're arguing, well, we should have gone beyond that and provided any evidence of improper Facebook activity, our understanding is that to the extent that there was any Facebook activity that would have responded or interacted with any of the derogatory information, that information would have been transmitted to CPP General Counsel's office. Counsel, we're just talking right past each other. Her concern is, I'm going to give you a hypothetical. Perhaps this investigating officer, and I'm not trying to disparage anybody, but perhaps he had not posted, but he had, you know, liked something that was very offensive, for example. I can imagine defense counsel would want that. And the description that you're describing, I mean, that you're giving me, is one that would have allowed that to not be produced. And opposing counsel is getting ready to get up, and you won't have an opportunity to respond. She's getting ready to get up and to say that would be a Hinthorn obligation. What is your response? Our understanding is that to the extent that there was any type of interaction with improper content, whether it was a response, a like, or any type of thumbs up, that was something that would have been covered. Impeaching, even if not subject to discipline, would be impeaching and discoverable? That would have been something that would have been snatched up by the CBP. I'm not asking about the CBP. I'm asking about whether it's subject to discipline or not. Why wouldn't it just be impeachment under a Hinthorn that would have to be produced to, or Brady, or however you want to, whichever of these obligations, because they're overlapping obligations. And why wouldn't that be discoverable? Well, in this case, I think we've established that that information didn't exist. We have. Well, we believe that we've established in our briefing that that information didn't exist. Because he didn't post. He didn't post. He didn't post. He didn't interact. That's what Agent Norelli testified to at the trial. And to the extent that there was any type of posting, that would have made it to CBP General Counsel's office, and that would have been disclosed to the AUSA during the Hinthorn check. So when you use the word post, you're including any response, any thumbs up? Correct. That's helpful. Correct. Okay. Well, that was tedious, but I think we got there. Did you want to speak to the Miranda issue? Yes. I'll get to Miranda. You know, I think the defense takes issue with whether or not the Miranda warning used the word can instead of will. And we'll concede that, you know, if you open up a dictionary and you look at the word can and will, you're going to get a different definition. But I think everyone knows that how words are used in the context of a sentence matters a great deal. And the way that the word was used in this case, you know, can as part of a directive with no other limiting language, I don't think there's any uncertainty with the use of the word can in this case. And I'll just pick up on the example that Hernandez used in his replay brief about, you know, the child asking a parent for a cookie. If a parent tells a child, you know, if you go clean your room, then you can have a cookie, I think the child is going to pretty much expect that cookie just inviolably if he goes and cleans his room. So there wasn't any Miranda violation in this case. It was reasonably conveyed to the defendant, and we urge the court to find that there was nothing wrong with the Miranda defense. Could you follow up on Judge Clifton's concern? I think it's a really good one. You know, this is a very skinny defense about whether it's not whether Mr. Hernandez was here unlawfully, it's how did he get here, and did the government really prove that he came across the border somewhere other than at a port of entry? And I don't know where the best place is to look in the record to figure out just how remote this location was. I fully appreciate that when asked whether he came through the mountains, he said he came through the mountains. But there's this Miranda issue. So can you fill us in about where should we look in the record for this geography? I think you can look at two places. You can look at the testimonies of Agent O'Reilly, who was the apprehending agent, and you can look at the testimony of the agent who was operating the surveillance scope. Agent O'Reilly testified that this person was apprehended eight miles away from the nearest port of entry, about two miles into the United States from the border. And, you know, eight miles away from the port of entry is a pretty far ways away. And Agent O'Reilly also testified that the location where he was found, there was no border wall there. And so it was a place where, you know, apical aliens were known to frequently cross because there were no border walls. And that's consistent with Mr. Hernandez's confession that he had walked through the mountain. Now I want to also turn to the testimony of the surveillance operator, and what he had testified to was that it was a remote area, very rugged, and he had surveilled the defendant for 17 minutes, watching him kind of cross through rugged terrain, wild brush. And, you know, I'll also add in the point that he gave no indication that there were any cars in the area. And so I think that is another sort of, there are many ways to define that. You know, it's highly unlikely that he was someone from the border, but that's just another. Something about a van, where was the van seen? You know, the van, I don't know that that is part of their appeal. I don't think they've challenged it. It's a record somewhere, so, I mean, it's before us. I just couldn't tell from the reference to it how far away the vehicle was from where he was. Yeah, and that was never developed in the record, because the judge denied that discovery, and they haven't developed that in this appeal. I don't think they're challenging anything. Was he in a helicopter? Is that what the evidence is for? I think the defendant had made some claim that there was a van somewhere, and I think that might have been uttered over the helicopter dispatch. By dispatch you mean the recordings of the radio traffic? The recordings of the radio traffic that was taken from the helicopter, yeah. Yeah, okay, okay. I know there's some other issues that we haven't gotten to, but I'm happy to answer any questions. Looks like we're out of questions. Thank you. Thank you very much. Thank you. Thank you. I would take, dispute the factual characterization by opposing counsel. I'm reading from ER 89, and this is going to the issue of if Agent Norelli ever posted. And on ER 89 it says, turning briefly to the Facebook group, did you ever post anything that is xenophobic, racist, prejudiced? No, sir. That's the only reference to it, and that's a subjective self-representation by the agent. It's not an admission that he posted. I mean, it's kind of an ambiguous answer. And that's the point. And that's the point. I think this goes to Judge Christian's question about was there evidence that he posted or not. There's nothing in the record that I'm aware of. The only thing in the record is that he didn't post anything racist, xenophobic. But things that he posted that, in other words, that's a very subjective characterization, and it doesn't rule out the idea that he did post something that, in our opinion, subjectively, or his subjective opinion, that could have gone towards impeachment. Was there not also representation by counsel to the court that this check had been made? There was a representation that the check had been made. But, again, I don't think that that necessarily put both parties on the same plane in terms of, well, was this post something that could be impeachable or not? Okay, so opposing counsel's other position on this, a counter on this, is that they answered the discovery request that they received. And the question was, is Agent Norelli a member of the group, or was he a member of the group? What is your response to that? They said that the night before. That didn't give us enough time. So that was wrong. I just, in my last few seconds, I want to briefly touch on Miranda. The example that I would give, for instance, would be if you practice every day, you can become a major league baseball pitcher. You know, there are situations where can means may. If you go to law school, you can make a million dollars. If it rains in March, flowers will grow in April. Can is not always will. And the problem is that Miranda requires it to always be will. Your argument almost requires a talismanic incantation of specific rules, and the Supreme Court has told us on more than one occasion there are no magic words here. As long as, in the totality of the circumstances, the court can satisfy itself that the defendant knowingly and voluntarily understood and waived his rights. I understand that, Your Honor, but can is very similar to may, and may is not good enough. This court has held that may is not good enough. And so the problem is that if, for instance, that's why the ABA model Spanish advisal doesn't use the translation that was used here. It uses something else. But in a hypothetical case, if the defendant has too many assets and doesn't qualify for appointment of counsel, then the court doesn't appoint one. Correct. So in that case, telling him that a lawyer can be appointed is conditional on the fact that he has to qualify. I think that that is correct. It is correct that there are times when can is used in a way that there is a condition that has not been satisfied. The problem is it can be used both ways, and because it's ambiguous, it wasn't good enough here. One last question.  We have, I think, what I read to be a factual finding on the coercion issue that the defense basically was engaged in trying to get a tactical advantage by jamming the court because of the fact that there was an outstanding restraining order on civil arrests in the courthouse that was going to expire the next day. What do we do with that finding by the trial court that there was no coercion here because it was a tactical move? Well, tactical moves are still not something that can be coerced. In other words, for instance, in Garrity, the Supreme Court case, what happened is there were police officers who were being questioned about misconduct. And they told the police officers, well, you have a Fifth Amendment right not to say anything, but if you don't say anything, you'll be fired. Right. They made a tactical decision. Right. And that, the Supreme Court said, is not good enough. Right, but that's a Fifth Amendment right to remain silent. Here there is no constitutional right to avoid a civil arrest for being an illegal alien found unlawfully in the United States. We would disagree. We would hold that the TRO that was eventually, you know, or was granted in this case, actually said that there was a constitutional right under the common law to avoid a courthouse arrest. But he had that restraining order not been converted into a preliminary or temporary injunction. After the second day, he wouldn't have had that coercion, right? Not protection, right? I think this, part of the problem here is also that the judge had no excuse for not resolving this at least 12 days before. You don't resolve discovery disputes the morning of trial. Well, but the discovery didn't reach the court until the morning of trial. That's not correct. It actually reached the court. It was finished briefing 12 days before trial. Okay. Thank you, Your Honor. Thank you. We'll take that case under advisement as one of the last cases on the oral argument.
judges: TALLMAN, CLIFTON, CHRISTEN